**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 08-CR-20032 |
| ) | |
| **DEZMIN STAR WOODLAND,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION**

On June 3, 2008, Defendant Dezmin Star Woodland was indicted on one count of being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On September 30, 2008, Defendant, through his court appointed counsel Assistant Federal Public Defender John Taylor, filed his First Motion to Suppress Evidence Pursuant to Rule 12 and 47 of the Rules of Criminal Procedure (#10). Along with the Motion (#10) Defendant filed that same day a Bench Brief in Support of the Motion to Suppress Evidence (#11). On December 1, 2008, the government, through Assistant United States Attorney Colin Bruce, filed its Response (#12). On January 22, 2009, an evidentiary hearing was held on the Motion to Suppress (#10). The transcript from the hearing was filed on January 27, 2009. On February 24, 2009, Defendant filed his Brief in Support of Motion to Suppress (#15) and the government filed its Response (#17) on March 31, 2009. For the following reasons, Defendant's Motion to Suppress (#10) is DENIED.

FACTUAL BACKGROUND

An evidentiary hearing on Defendant's Motion to Suppress (#10) was held before the court on January 22, 2009. The government waived an opening statement and accepted the burden of the presentation of evidence.

The first witness called by the government was Lonny Llewellyn, the arresting officer. Llewellyn was a patrol officer for the Decatur, Illinois, Police Department and had been with the department for ten years. On May 17, 2008, Officer Llewellyn was on patrol between approximately 11:30 and midnight, in full police uniform, near the area of business known as Block's Brewery. It was part of Llewellyn's usual practice on that shift to patrol the area of Block's because on weekends it was known for trouble. Officer Llewellyn had patrolled the downtown third shift for about a year. Llewellyn knew many of Block's clientele to be gang members who now frequented and caused trouble at the bar. These gang members had moved to Block's when a previous bar they frequented, known as the Viper Pit, closed down. Llewellyn and the police had been called plenty of times to the Viper Pit to break up fights and investigate property damage and they were now starting to see the same problems with the same clientele at Block's.

At about 11:55 pm that night Llewellyn drove through the parking lot at Block's Brewery and observed Defendant sitting in a vehicle parked in the parking lot. Defendant, who Llewellyn had never had contact with before, was in the passenger seat with the window down. Defendant was the only person in the vehicle. When Llewellyn first observed him, Defendant was sitting upright looking out the window, but as Llewellyn drove towards him and made eye contact, Defendant slouched over in the seat "as if he were trying to hide" from Llewellyn. Llewellyn felt the way Defendant was acting was suspicious because it looked as if Defendant was trying to hide from him.

Llewellyn parked three or four cars away from Defendant and approached Defendant's vehicle on foot.

Llewellyn asked Defendant what he was doing and Defendant said he was waiting for his cousin. Defendant told Llewellyn his name and the officer returned to his squad car to run the name through the LEADS system. Llewellyn then learned that Defendant was on parole through the Illinois Department of Corrections (IDOC). Llewellyn returned to Defendant's vehicle and asked him if he was on parole, and Defendant admitted that he was. Llewellyn ordered Defendant out of the car and told him he was going to search him. Llewellyn never pointed his gun at Defendant during the encounter. Defendant exited the car and Llewellyn patted him down. Through his training with the Decatur Police Department, Llewellyn knew that he had the ability to search anyone on parole through the IDOC. Llewellyn noticed a bulge in Defendant's right front pocket and could immediately tell it was a gun. Llewellyn removed the gun from Defendant's pocket and handed it to a backup officer who had arrived on the scene. Defendant was then placed under arrest.

Officer Llewellyn was then cross examined by Federal Public Defender John Taylor. Llewellyn had responded to several fights in the parking lot at Block's. Llewellyn stated that he was not blocking Defendant's car with his squad car when he approached him on foot. The parking lot in question was also frequented by gang members and "troublemakers." Attorney Taylor asked Llewellyn what suspicions he had of any possible illegal activity being done by Defendant at that time. Llewellyn stated that it was his experience as a patrol officer of ten years that people sitting in their cars outside of bars were not going inside. Or, at the Viper Pit, people would exit the bar to their car, smoke marijuana, and go back inside the club. Also, there were hand to hand drug

transactions in bar parking lots, including the Viper Pit. However, Llewellyn did not suspect Defendant of a "hand-to-hand" and did not observe him smoking marijuana nor did Llewellyn smell marijuana. Llewellyn did state that just because he did not see marijuana in Defendant's hand or see smoke, that did not mean he did not suspect drugs were present. Llewellyn's suspicions were further raised when Defendant slumped over to the driver's side as he made eye contact with the officer. Defendant's presence in the bar parking lot and evasive maneuver to avoid being seen made Llewellyn suspect that Defendant was either smoking marijuana or drinking liquor illegally. Llewellyn walked back to Defendant's car to see why Defendant was trying to hide from him and to see if he could smell marijuana. When he arrived the window was down and no smell of marijuana was present. Llewellyn did not see anything else that indicated criminal activity, but it did not eliminate Llewellyn's suspicion, as his main intent in approaching the car was to find out why Defendant was hiding from him. After getting Defendant's information and running it through LEADS, Llewellyn learned Defendant was on parole. His training with the Decatur police told him that he had the right to search Defendant and search the area that Defendant is sitting in, as well as his parole address. He learned he had this right through the training sergeant at the station. After learning the policy, Llewellyn searched several other parolees besides Defendant in this manner. He would search them for no other reason than they were on parole. It was his good faith belief at the time that it was his legal right as an officer to search a parolee without more.

After learning Defendant was a parolee with no warrants, Llewellyn still believed there must be a reason he was hiding from him. The fact that Defendant was on parole played a direct role in Llewellyn's continued investigation. Had Defendant not been on parole, and as Llewellyn did not see or smell any marijuana, he would have had no other reason to get Defendant out of the car.

Llewellyn went back to the car because Defendant was on parole and had tried the evasive maneuver and Llewellyn wanted to search him. Both factors were equally important to Llewellyn.

On re-direct, it was established that, even with the evasive behavior, if Defendant was not on parole he would not have been asked to exit the car. Defendant would have been free to go as Llewellyn would have had nothing more to go on.

PROCEDURAL BACKGROUND

Following the conclusion of the evidentiary hearing, the court ordered a transcript to be prepared and the parties to submit bench briefs based on the transcript. The transcript (#14) was filed on January 27, 2009, and the Defendant's Brief in Support of Motion to Suppress (#15) was filed February 24, 2009, and the government's Response (#17) was filed March 31, 2009.

Defendant admits that the officer did not block Defendant's vehicle, and as long as Defendant did not feel he was required to comply with the request for his name, the approach and question was likely constitutional. However, Defendant contends that Llewellyn did not have the right to order Defendant out of the car and search him solely for the reason that he was on parole. Defendant notes that the parole agreement signed by Defendant stating that he "shall consent to a search of [his] person, property, or residence under [his] control" does not refer, anywhere in the document, to police officers. Rather, the only references contained to any law enforcement agency in the parole agreement are to parole officers and agents of the Department of Corrections. Defendant contends that U.S. Supreme Court precedent allowing suspicionless searches of parolees for no other reason than they are on parole, extends only to those situations where parolees sign parole agreements specifically stating who can search them, and then the search is conducted by one of those named law enforcement agencies. Therefore, since the particular parole agreement in

question in Defendant's case was silent as to police officers searching Defendant, it was improper for Llewellyn to ask Defendant to exit the vehicle without more.

The government argues that Llewellyn's search was reasonable and permissible because of Defendant's parole status and the conditions of his parole. The government believes that the parole conditions of Defendant are similar to those of the parolees in the U.S. Supreme Court cases that allowed for searches. Defendant had a diminished expectation of privacy combined with the search condition of his parole that permitted the search so that it was not unreasonable nor in violation of the Fourth Amendment. Alternatively, the government argues the search was a permissible investigatory detention, or "Terry stop"(Terry v. Ohio, 392 U.S. 1 (1968)) under the totality of the circumstances, in that Defendant was in an area Llewellyn knew from personal experience to be frequented by gang members and where fights and property destruction had taken place. Further, Defendant's evasive maneuvers made Llewellyn suspicious, especially after he learned Defendant was on parole. Because of this reasonable suspicion, Llewellyn could order Defendant from the car and conduct a search for safety purposes.

## ANALYSIS

Under the facts of the case, the success of Defendant's Motion (#10) depends on two main issues: 1) did Officer Llewellyn have the authority under Defendant's parole Agreement to order him from the car and search him based on nothing more than the fact that Defendant was on parole and, if not, 2) was the search justified as a Terry stop?

The main issue appears to be whether the terms of Defendant's parole Agreement subjected him to searches on his person not just from parole officers, but from police officers as well. The actual Illinois parole/MSR (Mandatory Supervised Release) Agreement, based on the language

found in Illinois's "Conditions of Parole or Mandatory Supervised Release" statute (730 ILCS 5/3-3-7 (West 2008) states:

"You shall consent to a search of your person, property, or residence under your control."

The Agreement mentions the Department of Corrections, Prisoner Review Board, and the Illinois state correctional facility, but nothing about police officers.

The Supreme Court of the United States has addressed the issue of "suspicionless searches" of parolees, most recently in <u>Samson v. California</u>, 547 U.S. 843 (2006). In <u>Samson</u>, the defendant was on state parole in California following a conviction for being a felon in possession of a firearm. A police officer, who knew him to be on parole and believed he was facing an at-large warrant, stopped the defendant as he was walking with a woman and child. The officer asked him whether he had a warrant outstanding, to which the defendant replied that he did not and was in "good standing" with his parole officer. The officer confirmed via radio dispatch that there was no warrant for the defendant. Nevertheless, pursuant to a section of the California Penal Code and based solely on the defendant's status as a parolee, the officer searched the defendant and located a cigarette box in his left breast pocket containing methamphetamine. California law provided that every prisoner eligible for release on state parole "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." <u>Samson</u>, 547 U.S. at 846; Cal.Penal Code Ann. § 3067(a). The Supreme Court granted certiori in the case to answer the following question: whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment. <u>Samson</u>, 547 U.S. at 847.

The Supreme Court, Justice Thomas writing, answered in the affirmative. The Court began its analysis by referring to its earlier holding in United States v. Knights, 534 U.S. 112 (2001), where it held that when an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable. Knights, 534 U.S. at 121. The Court noted that in Samson, the defendant, as a parolee, had severely diminished expectations of privacy by virtue of his status alone as a parolee under California's laws. Samson, 547 U.S. at 852. Further, in Samson the defendant signed a parole condition making him subject, at any time, to a suspicionless search by parole officers or other peace officers, and that acceptance of that clear and unambiguous search condition significantly diminished the defendant's expectation of privacy. Samson, 547 U.S. at 852. Examining the totality of the circumstances pertaining to the defendant's status as a parolee, including the plain terms of the parole search condition, the Court concluded that the defendant did not have an expectation of privacy that society would recognize as legitimate. Samson, 547 U.S. at 852.

The Seventh Circuit has also addressed the issue of parolee searches. In United States v. Hagenow, 423 F.3d 638 (7th Cir. 2005), the defendant was placed on probation for a criminal confinement conviction in Indiana state court. When placed on probation, he signed a document that read in part: "You shall waive any and all rights as to search and seizure during your period of probation, and submit to search of your person or property by any police officer if a search is requested by a probation officer of this court." Hagenow, 423 F.3d at 641. His conditions of probation also included a prohibition on owning or possessing firearms and dangerous weapons. While still on probation the defendant was charged with illegally shooting a deer with a shotgun,

leading his probation officer to ask the defendant to submit to a lie detector test. When he was shown to be deceptive on the lie detector test as to whether had shot a deer with the shotgun, the local prosecutor's office requested an investigation be launched as to whether the defendant possessed a shotgun. A confidential informant told a police officer that he saw a handgun in the defendant's possession, a 12 gauge shotgun, and a long box that the defendant told him contained a gun. The officer testified as to what the confidential informant told him and a search warrant was executed on the defendant's home, locating the weapons in question.

Citing Knights, the Seventh Circuit found that officers needed no more than reasonable suspicion to justify the search of the defendant's home while he was on probation. Hagenow, 423 F.3d at 642. "Reasonable suspicion amounts to something less than probable cause but more than a hunch, and exists when there is some 'objective manifestation' that a person is, or is about to be, engaged in prohibited activity. Ultimately, a court's determination of reasonable suspicion must be based on common-sense judgments and inferences about human behavior." Hagenow, 423 F.3d at 642. Because the defendant signed this waiver agreeing to submit to searches while on probation, the search was justified as there was reasonable suspicion of illegal activity.

In United States v. Barnett, 415 F.3d 690 (7th Cir. 2005), the Seventh Circuit held that a defendant's blanket waiver of Fourth Amendment rights as a condition of plea bargain pursuant to which he was sentenced to intensive probation supervision in lieu of imprisonment justified a search of his home.

Further, in People v. Wilson, 885 N.E.2d 1033 (Ill. 2008), the Illinois Supreme Court ruled that no reasonable suspicion was required for a warrantless search of a defendant's bedroom, given his status as a parolee and the plain language of the search condition of his parole/MSR Agreement.

In that case, the defendant was placed on MSR for a 15-year sentence for armed violence. Upon release, he signed a "Parole or Mandatory Supervised Release Agreement" based on the language found in 730 ILCS 5/3-3-7. One of the conditions was "You shall consent to a search of your person, property, or residence under your control." The defendant was subsequently arrested on a warrantless search of his apartment by police officers when they were tipped off about possible narcotics in the apartment. The defendant was arrested and charged with drug possession. At the suppression hearing, the officer in question admitted that he did not have a warrant to search the defendant or his room but that the defendant's "consent was not needed because defendant's MSR Agreement constituted defendant's consent to any searches of his person, property, or residence." Wilson, 885 N.E.2d at 1036.

The Illinois Supreme Court held that the search was proper. One of the defendant's arguments was that the search and parole conditions for the California petitioner in the U.S. Supreme Court's Samson case were different than those in his Illinois case. The Illinois court disagreed, writing:

> "We recognize the distinct wording in each search condition, but hold that the differences are of form, and not substance. In each state, the parolee is obligated to comply with the search demands of law enforcement officers or face potential revocation of parole. Despite defendant's protestations to the contrary, the legal and practical effect of his search condition is no different from that of the search condition at issue in Samson." Wilson, 885 N.E.2d at 1042.

The court went on to write:

"Defendant also maintains that, while California's search condition explicitly allowed for a search without cause by a police officer, his search condition does not and is, therefore, indicative of a greater expectation of privacy. In addressing this contention, we turn to [People v. Moss, 842 N.E.2d 699 (Ill. 2005)], where we considered a search condition identical to defendant's. In Moss, we held that the search condition puts the parolee 'on notice that law enforcement officials may ask his consent to search his 'person, property, or residence ***'*** with out without reasonable suspicion.' Moss, 842 N.E.2d at 710. We further explained that this search condition has no 'limitation on what government agent may perform that search or what purpose they may have.' Moss, 842 N.E.2d at 712. As such, we find no merit in defendant's argument that his search condition was in any way less 'explicit' than that considered in Samson." Wilson, 885 N.E.2d at 1042.

The case law establishes that, under Samson, the search of Defendant would be reasonable if it were done by a parole officer. The big question remains as to whether a police officer, if not specifically listed in a parole/MSR Agreement, can conduct a "suspicionless search." It does not appear that the Seventh Circuit has had to address that particular factual situation. However, from all appearances, the Seventh Circuit has given wide breadth to interpretations of parole agreements and the like. If a police officer is found to have the same powers of searching a parolee under the Agreement as a parole officer, the search was likely valid. Further, as shown in Wilson, the Illinois Supreme Court itself has found the MSR Agreement and parole conditions in Illinois to have just as little privacy expectation as the California one at issue in Samson. The Illinois Supreme Court did not see any difference in whether the law enforcement agent performing the search was a parole

officer or police officer, even though the parole/MSR Agreement in question was silent as to whether a police officer could conduct a search of the parolee at "anytime." See Wilson, 885 N.E.2d at 1042. As a federal court, we should defer to the Illinois Supreme Court's statutory interpretation of Illinois law. See Heidelberg v. Illinois Prisoner Review Board, 163 F.3d 1025, 1027 (7th Cir. 1998) ("[federal courts] are bound to follow a state's highest court's interpretation of its own state law.").

Defendant's parole/MSR Agreement contains a condition relating to searches that is nearly identical to the one considered by the Illinois Supreme Court in Wilson. Like the agreement in Wilson, Defendant was subject to searches of his person, property, or residence under his control. Like the agreement in Wilson, there was no explicit reference to police officers being authorized to conduct the search. However, the Illinois high court ruled that despite the MSR Agreement's silence as to the authority of the police to search a parolee, police officers had the same power as parole or Department of Corrections employees to conduct warrantless, suspicionless searches of parolees. Wilson, 885 N.E.2d at 1042. This court will defer to the Illinois Supreme Court's interpretation of the Illinois parole/MSR Agreement. The terms of the Illinois parole/MSR Agreement subjected Defendant, as an Illinois parolee, to searches of his person by police officers despite police officers not being explicitly listed as authorized to conduct the search in the Agreement. Therefore, this court finds that Officer Llewellyn's search of Defendant was reasonable and proper. As the court has determined the search was valid under the terms of the parole/MSR Agreement, there is no need to reach the government's Terry stop argument. Defendant's Motion to Suppress (#10) is denied.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion to Suppress (#10) is DENIED.

(2) This case remains scheduled for a status conference on April 17, 2009, at 9:30 a.m.

ENTERED this 15th day of April, 2009

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE